IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| YENETAMIE DÍAZ-ZAYAS, et al., **Plaintiffs** v. MUNICIPALITY OF GUAYNABO, et al., **Defendants** | CIVIL NO. 18-1668 (RAM) |

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

Plaintiffs Yenetamie Díaz-Zayas ("Díaz") and Angel Reyes ("Reyes") (collectively, "Plaintiffs") filed this action against the Municipality of Guaynabo (the "Municipality" or "Guaynabo"), Guaynabo's ex-mayor, Héctor O'Neill-García ("O'Neill"), and his wife, Alba Alvelo-Colón ("Alvelo") (with O'Neill, the "Individual Defendants," and, collectively with the Municipality, "Defendants"). Plaintiffs seek redress for alleged constitutional violations as well as discrimination and retaliation during their employment with the Guaynabo Municipal Police Department. The *Amended Complaint* alleges Defendants violated: 42 U.S.C. § 1983 ("Section 1983"); Title VII of the Civil Rights Act of 1964 ("Title VII"); Puerto Rico's general anti-discrimination statute, Law No. 100 of June 30, 1959, P.R. Laws Ann. tit. 29 §§ 146, et seq. ("Law 100"); and Articles 1802 and 1803 of the Puerto Rico Civil Code,

P.R. Laws Ann. tit. 31 §§ 5141 and 5142. Pending before the Court are Defendants' *Motions to Dismiss* at Docket Nos. 53 and 55.

For the reasons detailed below, the Court **GRANTS IN PART AND DENIES IN PART** the Municipality's *Motion to Dismiss* at Docket No. 53 and **GRANTS** the Individual Defendants' *Motion to Dismiss* at Docket No. 55.

## I. FACTUAL BACKGROUND[1]

Díaz was first hired by the Guaynabo Municipal Police Department in 2009. (Docket No. 51 ¶ 10). At that time, she was a single mother with a special needs child. Id. ¶ 11. Shortly after starting her position, Díaz approached the then-mayor of Guaynabo, O'Neill, to inquire about potential assistance for her special needs daughter. Id. ¶ 13. O'Neill invited Díaz for several lunches and then dinners. Id. ¶¶ 15-17. Plaintiffs allege that after an unspecified number of dinners, O'Neill pressured Díaz to have sex with him. Id. ¶ 19. Díaz claims she only acceded because she was afraid to lose her job if she refused the mayor's sexual advances. Id. ¶ 20. Plaintiffs further allege that Díaz engaged in sexual relations with O'Neill until she ended the relationship in October 2014 and that during that time, O'Neill physically and sexually abused her. Id. ¶¶ 23-26.

---

[1] The Court's factual recitation is taken from Plaintiffs' allegations in the *Amended Complaint*, the content of which must be accepted as true at this stage of the proceedings. *See* Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).

By November 2014, Díaz was working as the director of the Division of Regulations and Environmental Matters ("DRAAS" by its Spanish acronym). Id. ¶¶ 36-38. Between November 2014 and June 2015, O'Neill regularly visited DRAAS for official business, including meetings and supervised operations. Id. ¶ 38. When he visited, Díaz hid to avoid seeing him. Id. ¶ 39. Despite her attempts to hide, Díaz claims O'Neill repeatedly tried to contact her during this time, including calling her from a blocked number. Id. ¶ 43.

While the *Amended Complaint* does not specify when, Díaz began seeing her now-husband, Reyes. Id. ¶ 27. Reyes had worked for the Guaynabo Municipal Police Department since 1996 and was promoted to sergeant in 2005. Id. ¶¶ 28-29. In 2012, he began working for the Transit Department, where he was able to earn significant overtime pay and was repeatedly recognized for his good work. Id. ¶¶ 31-34. Plaintiffs posit that when O'Neill learned of their relationship, he began to retaliate against them. Id. ¶ 35.

After the initiation of their relationship, one of Reyes's supervisors saw Díaz and Reyes eating breakfast together at a bakery. Id. ¶ 45. Following that encounter, Reyes asserts that his requests for shift changes — which had previously been routinely granted — were repeatedly denied by his supervisors. Id. ¶¶ 46-47. Reyes was then transferred from his unit and was no longer eligible for overtime work. Id. ¶ 48.

On November 2, 2015, Police Commissioner Wilfredo Martinez ("Commissioner Martinez") told Díaz that, if she wanted to continue working for the Guaynabo Municipal Police Department, she would either have to accept a demotion within DRAAS or be transferred to the traffic division. Id. ¶ 64. Commissioner Martinez allegedly admitted that this order came directly from O'Neill. Id. ¶ 66. Díaz immediately called O'Neill to discuss her demotion. Id. ¶ 68. The two arranged a meeting at O'Neill's apartment for that afternoon. Id. ¶ 69. Díaz alleges O'Neill told her she could fix her work situation by being with him again and that the meeting ended with a physical altercation between the two. Id. ¶¶ 74, 79-83.

On either November 10 or 11, 2015, Díaz spoke with Commissioner Martinez again regarding her work situation. Id. ¶ 92. Commissioner Martinez reiterated that he was powerless to change her employment status at that time. Id. ¶ 93. On January 7, 2016, Díaz was officially demoted within DRAAS. Id. ¶¶ 96-102. Díaz felt "denigrated as a woman," as she was the only woman in the office and had been replaced in her role by a man despite having done nothing wrong. Id. ¶ 103. Throughout January 2016, her coworkers made multiple sexist comments in her presence, and Plaintiffs presume it was at O'Neill's instruction. Id. ¶¶ 116-21.

In early 2016, Díaz was reassigned twice. First, on February

1, 2016, she was reassigned to the intake station and ordered to investigate civilian complaints. Id. ¶¶ 136-37. Then, on March 14, 2016, she was transferred to work as a security guard in a guardhouse outside the Center of Operations. Id. ¶¶ 153-54. Díaz claims O'Neill drove by the guardhouse numerous times and made sexist comments or sexual movements at Díaz. Id. ¶¶ 172-76, 194-97. Díaz was the only woman working at that security post and was forced to share an unsanitary bathroom with her male colleagues, even though she requested better bathroom accommodations. Id. ¶¶ 181-83.

During this time, in addition to the retaliatory demotions, O'Neill allegedly harassed and threatened Plaintiffs by repeatedly screaming at Díaz over the phone, claiming to be tracking her movements, and stating that he wanted to hurt Reyes. Id. ¶¶ 49-53, 60-61, 130. Díaz also claims O'Neill harassed her at work. Most notably, in late January 2016, Díaz walked into her office and encountered O'Neill masturbating while sitting in her chair. Id. ¶¶ 132-33. Díaz notes she was too afraid to report this conduct at the time. Id. ¶¶ 134-35.

These actions, and others outlined in the *Amended Complaint* but not repeated here, prompted Díaz to file a charge of discrimination with the Equal Employment Opportunity Commission

("EEOC") on June 30, 2016.[2] Id. ¶ 206. Once the EEOC began its investigation, O'Neill contacted Díaz through a friend requesting that the two settle the claims. Id. ¶ 207. Díaz, without the assistance of an attorney, negotiated an agreement whereby she would withdraw her charge in exchange for a payment and promise from O'Neill to cease his retaliatory conduct. Id. ¶ 208. The agreement also provided that Díaz would be restored to her old role as coordinator in the DRAAS office. Id. ¶ 218. The agreement was signed on December 27, 2016. Id. ¶ 215. Although O'Neill paid the money, Díaz was not given her old job back and the retaliation allegedly continued. Id. ¶¶ 218-42. Following her First EEOC Charge, only one officer allowed Díaz to perform her duties, and only for a week or so. Id. ¶ 260.

Díaz then filed her Second EEOC Charge due to the retaliation she allegedly experienced after filing the First EEOC Charge. Id. ¶ 276. O'Neill resigned as Mayor shortly thereafter. Id. ¶ 277. Based on Plaintiffs' information and belief, O'Neill continues to meet with municipal employees to instruct them on how to maintain the retaliation against Díaz and Reyes. Id. ¶ 278. And, as recently

---

[2] The *Amended Complaint* suggests that Díaz filed an EEOC charge before June 30, 2016. *See* id. ¶ 56 (mentioning an EEOC complaint while discussing events in 2015). However, Plaintiffs did not provide a date or charge number for any 2015 EEOC charge, as they did for the one dated June 30, 2016. Id. ¶ 206. Additionally, Plaintiffs refer to Díaz's 2017 EEOC charge as her "second EEOC complaint," which suggests the June 30, 2016 charge was her first. Id. ¶ 276. Thus, despite the confusion created by the *Amended Complaint*, the Court refers to Díaz's June 30, 2016 charge as the "First EEOC Charge" and the 2017 charge as the "Second EEOC Charge."

as December 23, 2018, Díaz claims O'Neill physically intimidated her by standing behind her at her post for more than an hour as her supervisor looked on. Id. ¶ 279.

## II.   PROCEDURAL BACKGROUND

On September 10, 2018, Plaintiffs filed their original complaint in this action. (Docket No. 1). Plaintiffs then successfully moved to amend the complaint and filed the *Amended Complaint* on February 1, 2019. (Docket Nos. 34; 48; 51). On February 15, 2019, Defendants filed their *Motions to Dismiss* pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Docket Nos. 53; 55). Plaintiffs opposed both *Motions to Dismiss* (the "*Opposition to the Municipality's MTD*" and the "*Opposition to the Individual Defendants' MTD*"). (Docket Nos. 59; 60). The Municipality subsequently filed a *Reply* in further support of its *Motion to Dismiss*, and Plaintiffs filed a *Sur-Reply*. (Docket Nos. 61-1; 64). The Court then stayed discovery in this case pending resolution of the *Motions to Dismiss*. (Docket No. 80).

## III.   MOTION TO DISMISS STANDARD

When ruling on a Rule 12(b)(6) motion, "[t]he sole inquiry . . . is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 7 (1st Cir. 2011). The Court must first "isolate and ignore statements in the complaint

that simply offer legal labels and conclusions or merely rehash cause-of-action elements." <u>Schatz</u>, 669 F.3d at 55 (citations omitted). Then, the Court takes "the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor," to determine "if they plausibly narrate a claim for relief." <u>Id.</u> (citations omitted). The analysis for a Rule 12(b)(1) motion "is essentially the same as a Rule 12(b)(6) analysis: we accept the well-pleaded facts alleged in the complaint as true and ask whether the plaintiff has stated a plausible claim that the court has subject matter jurisdiction." <u>Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.</u>, 4 F.4th 63, 69 (1st Cir. 2021) (citation omitted).

## IV.  ANALYSIS

### A. Section 1983 Claims

"Section 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place under color of any statute, ordinance, regulation, custom, or usage, of any State." <u>Klunder V. Brown Univ.</u>, 778 F.3d 24, 30 (1st Cir. 2015) (internal quotation marks and citation omitted). To state a viable Section 1983 claim, "a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued." <u>Id.</u> (citation omitted). "For purposes of Section 1983, Puerto Rico is the functional equivalent of a state."

Santiago v. Puerto Rico, 655 F.3d 61, 69 (1st Cir. 2011) (citation
omitted). To find that a private person acted under color of state
law, their actions must be fairly attributable to the State. Id.
at 68.

    1. Freedom to Associate Claims

    Plaintiffs    first    assert    Section    1983    claims    against
Defendants, arguing they "violated [P]laintiffs' free association
rights by discriminating against them and retaliating against them
for associating with each other and eventually marrying." (Docket
No. 51 ¶ 281). However, even when "construing the well-pleaded
facts of the complaint in the light most favorable to" Plaintiffs,
Plaintiffs have failed to plausibly state any First Amendment
violation. Ocasio-Hernandez, 640 F.3d at 7.

    The Supreme Court of the United States "has identified two
types of 'freedom of association' that merit constitutional
protection: (i) 'choices to enter into and maintain certain
intimate human relationships' and (ii) association 'for the
purpose of engaging in those activities protected by the First
Amendment.'" URI Student Senate v. Town of Narragansett, 631 F.3d
1, 12-13 (1st Cir. 2011) (quoting Roberts v. U.S. Jaycees, 468
U.S. 609, 617-18 (1984)). At issue here is the first category —
the right to "enter into and maintain certain intimate human
relationships[.]" Roberts, 468 U.S. at 617. The Supreme Court has
recognized "several    intimate    associations    that    constitute

fundamental rights and receive strict scrutiny review, including those that 'attend the creation and sustenance of a family — marriage, childbirth, the raising and education of children, and cohabitation with one's relatives.'" Poirier v. Massachusetts Dep't of Correction, 558 F.3d 92, 95 (1st Cir. 2009) (quoting Roberts, 468 U.S. at 619). Beyond the list of bright-line fundamental rights, "the Court has explained that human relationships are arrayed on a spectrum 'from the most intimate to the most attenuated of personal attachments.'" Id. (quoting Roberts, 468 U.S. at 620). Therefore, courts must engage in a "careful assessment" to determine where on the spectrum the relationship in question falls. Id.

The First Circuit has cautioned against expanding the protections of the First Amendment's freedom of association beyond the bright-line fundamental rights addressed above. For example, the court declined to expand the categories to include the right to the unmarried cohabitation of adults. Id. at 96. The First Circuit is especially wary of affording constitutional protections to ill-defined relationships. Id. Therefore, Plaintiffs have the burden to precisely define the relationship they seek to protect. Id. That allows the court to engage in the necessary "careful assessment." Id. at 95; see also id. at 95-96 ("Poirier, as the plaintiff, has the responsibility to identify the right she seeks to vindicate.").

Here, Plaintiffs contend Defendants violated their free association rights by impeding their ability to associate with each other and eventually marry. (Docket No. 51 ¶ 281). However, Plaintiffs' *Amended Complaint* presents no facts in support of such a claim. Most critically, Plaintiffs do not outline any timeline for their relationship or ever tie any alleged discriminatory or retaliatory acts by Defendants to a concrete hinderance on their right to associate. They do not state when they met, when they began dating, when they moved in together, when they became engaged, or even when they were married. Without that crucial information, the Court cannot ascertain the precise relationship Plaintiffs contend was inhibited at any given time. In fact, the well-pleaded facts in the *Amended Complaint* detail a relationship that ostensibly began during the events at issue in this case and ended in a successful marriage. For these reasons, Plaintiffs failed to adequately allege how Defendants' actions impermissibly violated their First Amendment right to free association.

2. <u>Freedom Not to Associate Claims</u>

Plaintiffs' attempt to entirely reorient their Section 1983 claims in the *Opposition to the Municipality's MTD* fares no better. Therein, Plaintiffs raise the argument — for the first time — that Defendants violated Díaz's First Amendment rights by punishing her for choosing not to associate with O'Neill. (Docket No. 59 at 3).

As an initial matter, "it is axiomatic that the complaint may

not be amended by the briefs in opposition to a motion to dismiss." Velazquez-Ortiz v. F.D.I.C., 2012 WL 1345174, at *6 (D.P.R. 2012) (citations omitted). Thus, the Court need not consider these after-the-fact allegations in determining the sufficiency of the *Amended Complaint* under Rule 12(b)(1) or 12(b)(6). Id.; (*compare* Docket No. 51 ¶¶ 280-82 *with* Docket No. 59 at 2-4).

Nonetheless, these claims must be dismissed because they are time-barred. "In Puerto Rico, [Section] 1983 claims are subject to a one-year statute of limitations." Morales-Tañon v. Puerto Rico Elec. Power Auth., 524 F.3d 15, 18 (1st Cir. 2008) (citation omitted). "The statute of limitations on such claims begins to run when the injury occurs, even if the plaintiff did not know of the discriminatory animus at that time." Id. All the alleged discriminatory incidents in the *Amended Complaint*, except for one, took place on or before June 8, 2017. (Docket No. 51 ¶¶ 266-75). Because Plaintiffs waited until September 10, 2018 to file the original complaint, well over a year after this June 2017 date, their Section 1983 claims are untimely.

While Plaintiffs point to one incident that occurred more recently, that incident does not save their untimely claims. Specifically, Plaintiffs allege that on December 23, 2018, O'Neill stood behind Díaz in an intimidating manner for more than an hour while her direct supervisor looked on. (Docket No. 51 ¶ 279). However, by December 23, 2018, O'Neill was no longer Mayor of

Guaynabo. Therefore, he was not a state actor, as required to properly allege a Section 1983 claim.

While O'Neill was undoubtedly a private party in December 2018, a private party can be deemed a state actor for Section 1983 purposes only "in rare circumstances" where one of the following three tests is met:

> The first test is the state compulsion test. Under this test, a private party is fairly characterized as a state actor when the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the challenged conduct must in law be deemed to be that of the State. The second test — the nexus/joint action test — deems a private party a state actor where an examination of the totality of the circumstances reveals that the state has so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the challenged activity. Finally, under the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been traditionally the exclusive prerogative of the State.

Klunder, 778 F.3d at 30-31 (internal quotation marks and citations omitted).

There are simply no alleged facts from which this Court can determine that O'Neill's act of standing behind Díaz constitutes state action under any of these tests. First, the *Amended Complaint* does not allege there was a state regulation that compelled or

encouraged O'Neill's actions, as required by the state compulsion test. *See* <u>Santiago</u>, 655 F.3d at 71. Second, there is no contention that the state and O'Neill operated under a symbiotic relationship during this time, as required by the joint action test. <u>Id.</u> Finally, Plaintiffs do not even attempt to argue that O'Neill engaged in any conduct that is traditionally the exclusive prerogative of the state. <u>Klunder</u>, 778 F.3d at 31. Plaintiffs fail to grapple with this issue, only contending in a conclusory fashion that "O'Neill is a state actor because the municipality through its officials and policies continues to treat him as such." (Docket No. 59 at 5). However, the facts as alleged in the *Amended Complaint* do not support that contention when analyzed using the three tests endorsed by the First Circuit. And, even drawing all reasonable inferences in Plaintiffs' favor, the Court finds that the mere fact that Díaz's supervisor watched O'Neill stand behind her does not constitute state action in furtherance of a First Amendment violation.

Finally, Plaintiffs have not alleged that any applicable tolling doctrine saves their otherwise untimely claims. As an initial matter, it is well settled that the filing of a charge of discrimination with the EEOC does not toll a Section 1983 claim, even if both claims arise from the same sequence of events. *See* <u>Hernandez-Mendez v. Rivera</u>, 137 F. Supp. 3d 142, 156-57 (D.P.R. 2015).

Plaintiffs argue that the Lilly Ledbetter Fair Pay Act of 2009 tolls the statute of limitations on their Section 1983 claims because, under that act, Defendants have violated Plaintiffs' rights each time their conjugal partnership receives a paycheck that does not compensate Reyes for overtime pay, as his lack of overtime pay is due to O'Neill demoting him in retaliation for dating and marrying Díaz. (Docket No. 59 at 4). However, the Court does not agree with Plaintiffs' broad interpretation of this act. While the First Circuit has yet to speak on the scope of the Lilly Ledbetter Fair Pay Act, the Second, Third, Tenth, and D.C. Circuits have "limited the reach of the Act to the specific claim in Ledbetter — that an employer is paying different wages or providing different benefits to similarly situated employees." Harrington v. Lesley Univ., 554 F. Supp. 3d 211, 223 (D. Mass. 2021) (collecting cases) (internal quotation marks and citations omitted). Pursuant to case law from Courts of Appeals outside the First Circuit, plaintiffs "must allege, in order to fall within the coverage of the Lilly Ledbetter Fair Pay Act, that [their] depressed salary resulted either from a low initial salary or from a series of accumulating inequitable promotions." Id. (citations omitted). Plaintiffs' contention that Defendants violated Díaz's First Amendment right to association by "depriving [her] of her supervisory position for terminating her relationship with then Mayor O'Neill" is far outside what circuit courts across the

country have determined is the scope of the Lilly Ledbetter Fair
Pay Act. (Docket No. 59 at 3). Thus, the act does not apply in
this case, and does not toll the statute of limitations on
Plaintiffs' Section 1983 claims.

    For the above-stated reasons, Plaintiffs' Section 1983 claims
are **DISMISSED.**

## B. Title VII

    Title VII "provides employees with the right to work in an
environment free from discrimination because of such employee's
race, color, religion, sex, or national origin." <u>Hernández v.
Wilkinson</u>, 986 F.3d 98, 102 (1st Cir. 2021) (citing 42 U.S.C.
§ 2000e-2(a)(1)). "Title VII also protects employees from being
discriminated against because the employee has opposed any
practice made an unlawful employment practice by this subchapter,
or because the employee has made a charge, testified, assisted, or
participated in any manner in an investigation, proceeding, or
hearing under this subchapter." <u>Id.</u> (quoting 42 U.S.C. § 2000e-
3(a)).

    Plaintiffs asserting Title VII claims must comply with a host
of procedural requirements. Most notably, under 42 U.S.C. § 2000e-
5(e)(1), Title VII plaintiffs must file an administrative charge
with the EEOC either 180 or 300 days "after the alleged unlawful
employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). "Because
Puerto Rico is a so-called 'deferral' jurisdiction, the

administrative charge must be filed within 300 days of the alleged unlawful conduct." Frederique-Alexandre v. Dep't of Nat. & Env't Res. Puerto Rico, 478 F.3d 433, 437 (1st Cir. 2007) (citation omitted).

"Administrative exhaustion also requires satisfaction of a 'presentment' requirement." Montalvo-Figueroa v. DNA Auto Corp., 414 F. Supp. 3d 213, 229 (D.P.R. 2019). To that end, "[a] Title VII suit may extend as far as, but not beyond, the parameters of the underlying administrative charge." Id. (citing Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005)). As courts in this District have noted, the First Circuit has inconsistently applied variations of two tests in determining whether a judicial complaint comes within the parameters of an administrative charge. See id. at 236. While the First Circuit has not endorsed a single test by which to conduct this analysis,[3] the Court finds Montalvo-Figueroa's discussion of the common themes that unite the First Circuit's body of case law on this issue instructive. Regardless of the precise test employed, "[n]one of the [First Circuit's] decisions require a judicial complaint precisely to mirror the administrative charge. Rather, the key is that the administrative charge alerts the employer and the EEOC as to the basis of the

---

[3] The First Circuit has, however, held that "retaliation claims are preserved so long as the retaliation is reasonably related to and grows out of the discrimination complained of to the agency - e.g., the retaliation is for filing the agency complaint itself." Clockedile v. New Hampshire Dep't of Corr., 245 F.3d 1, 6 (1st Cir. 2001).

discrimination claim that the employee first raises in federal court." Id. at 236-37. Thus, a plaintiff "may raise collateral and alternative bases or acts not within the four corners of the underlying administrative charge" that "bear some close relation to the allegations in the administrative charge[.]" Id. at 237 (internal quotation marks and citations omitted).

### 1. Title VII Claims Against the Individual Defendants

The Court begins with a discussion of the Title VII claims brought against the Individual Defendants. It is well settled in the First Circuit that "plaintiffs may not bring Title VII suits against individual employees[.]" Uphoff Figueroa v. Alejandro, 597 F.3d 423, 431 (1st Cir. 2010) (citing Fantini v. Salem State Coll., 557 F.3d 22, 30 (1st Cir. 2009)). Plaintiffs not only failed to challenge this case law in their briefs, they freely admit that "Title VII does not make individual supervisor[s] liable for their discriminatory acts." (Docket No. 60 at 3). For this simple reason, Plaintiffs' Title VII claims against the Individual Defendants are **DISMISSED**.

### 2. Reyes's Title VII Claim

Having determined that Plaintiffs may only assert a Title VII claim against the Municipality, the Court now turns to the merits of each Plaintiff's claim. Unlike Díaz's claim, discussed further below, Reyes's Title VII claim must be dismissed for several reasons.

First, the *Amended Complaint* is devoid of any facts detailing Reyes's exhaustion of administrative remedies. As noted above, to bring a civil action for employment discrimination pursuant to Title VII, an employee must first file an EEOC charge within 300 days of the alleged unlawful employment practice. *See* Frederique-Alexandre, 478 F.3d at 437. "Failure to exhaust this administrative process bars the courthouse door." Aly v. Mohegan Council, Boy Scouts of Am., 711 F.3d 34, 41 (1st Cir. 2013) (internal quotation marks and citation omitted). Furthermore, courts in this District regularly dismiss Title VII claims when a complaint contains no allegations regarding the filing of an EEOC charge. *See, e.g.*, Diza-Rosado v. Rodriguez-Casado, 2011 WL 2634147, at *2 (D.P.R. 2011) ("In the complaint, Plaintiff presented no allegations related to the filing of a complaint with the EEOC. As such, dismissal of Plaintiff's Title VII claims is proper because Plaintiff has failed to properly state a claim.").

In support of its *Motion to Dismiss*, the Municipality attached as an exhibit Reyes's charge of discrimination and the corresponding Notice of Right to Sue letter. (Docket Nos. 53-1; 53-2).[4] Therefore, though the *Amended Complaint* failed to mention

---

[4] Although these documents were not incorporated in Plaintiffs' *Amended Complaint*, the Court may consider them in its consideration of a Rule 12(b)(6) motion because it is a public document of which a court may take judicial notice. *See* Chambers v. District of Columbia, 249 F. Supp. 3d 66, 70 n.6 (D.D.C. 2017) ("Where, as here, the defendant alleges a failure to exhaust administrative remedies . . ., the Court, in addition to the pleadings, may consider the plaintiff's charge of discrimination without converting the motion

Reyes's EEOC charge, he did file one. However, Reyes then failed to file a civil action within ninety (90) days of receiving his Notice of Right to Sue letter, which warrants dismissal of his Title VII claim. *See* 42 U.S.C, § 2000e-5(f)(1). Specifically, the letter was issued on July 20, 2017. (Docket No. 53-1). Reyes did not file his initial complaint until September 10, 2018 (Docket No. 1), well over ninety (90) days from receipt of the letter.

Finally, Reyes failed to establish that any equitable tolling doctrine applies. "The charge-filing requirement is mandatory but not jurisdictional; therefore, it is subject to a host of equitable exceptions." Jorge, 404 F.3d at 565 (citations omitted). However, in deference "to Title VII's carefully crafted temporal limitations," courts in the First Circuit "invoke those exceptions sparingly and interpret them narrowly." Id. For equitable tolling to apply, the plaintiff generally must show that circumstances beyond their control precluded timely filing. *See* Monrouzeau v. Asociacion Del Hosp. Del Maestro, Inc., 153 F. App'x. 7, 8 n.1 (1st Cir. 2005). In the absence of any facts or arguments regarding equitable tolling in Plaintiffs' *Amended Complaint* or subsequent briefs, Reyes's Title VII claim is time-barred and therefore **DISMISSED.**

---

to dismiss because this document is a public document of which a court may take judicial notice." (internal quotation marks and citation omitted)).

### 3. Díaz's Title VII Claim

There are various forms of actional sexual harassment claims recognized under Title VII, namely *quid pro quo* harassment claims, hostile work environment claims, and retaliation claims. *See* Hernandez-Mendez, 137 F. Supp. 3d at 151. The *Amended Complaint* contains allegations directed at all three. Thus, each is addressed in turn below.

#### i. Hostile Work Environment Claim

To sufficiently state a Title VII hostile work environment claim, a plaintiff must allege:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 (1st Cir. 2007) (citation omitted).

In addition to substantive requirements, Plaintiffs asserting a hostile work environment claim under Title VII must comply with the above-mentioned procedural requirements. Relevant here is the requirement that Title VII plaintiffs file an administrative charge with the EEOC 300 days after the "alleged unlawful

employment practice occurred." 42 U.S.C. § 2000e-5(e)(1);
Frederique-Alexandre, 478 F.3d at 437.

Ordinarily, "a plaintiff may not recover for discrete acts of
discrimination or retaliation that occur outside the statutory
time period[.]" Frederique-Alexandre, 478 F.3d at 437 n.4.
However, a party alleging a hostile work environment claim may, in
many circumstances, invoke the continuing violation doctrine. This
doctrine enables a plaintiff to "obtain recovery for
discriminatory acts that otherwise would be time-barred so long as
a related act fell within the limitations period." Tobin v. Liberty
Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009). The First Circuit
has described hostile work environment claims "as the classic
example of a continuing violation because the actionable wrong
consists of an accumulation of individual acts that, taken
together, create the environment." Maldonado-Cátala v.
Municipality of Naranjito, 876 F.3d 1, 9 (1st Cir. 2017) (internal
quotation marks and citation omitted).

The *Amended Complaint* unquestionably outlines a multi-year
period of workplace harassment allegedly instigated and directed
by O'Neill. However, Díaz did not file her Second EEOC Charge until
August 3, 2017. (Docket No. 31-1). Thus, this Court may consider
Defendants' behavior dating back to Díaz's early years of
employment only if the *Amended Complaint* alleges related incidents
that occurred within 300 days of August 3, 2017. *See* Maldonado-

Cátala, 876 F.3d at 10. However, the *Amended Complaint* does not
include any allegations of related sexual harassment *after* October
7, 2016.

While the *Amended Complaint* does allege that Díaz continued
to suffer from a hostile work environment after October 7, 2016,
it is devoid of any allegations of harassment *based upon sex* that
occurred between October 7, 2016 and August 3, 2017. (Docket No.
51 ¶¶ 207-276); *see also* Forrest, 511 F.3d at 228 (stating that a
Title VII hostile work environment claim must allege that the
harassment was based upon sex). Therefore, the Court cannot employ
the continuing violation doctrine. Díaz failed to allege a timely
hostile work environment claim, and thus her Title VII claim based
on this theory is **DISMISSED** as time-barred.

          *ii.  Quid Pro Quo Harassment Claim*

*Quid pro quo* sexual harassment violates Title VII when "an
employee or supervisor uses his or her superior position to extract
sexual favors from a subordinate employee, and if denied those
favors, retaliates by taking action adversely affecting the
subordinate's employment." Valentin-Almeyda v. Municipality Of
Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (internal quotation
marks and citations omitted).

Díaz undoubtedly alleges facts supporting such a claim. (*See*
Docket No. 51 ¶ 20 ("Officer Díaz did not want to have sex with
Mayor O'Neill . . . but she was afraid that he would fire her if

she refused, so she gave in, against her will."); *see also* id.
¶ 35 ("When Officer Díaz began dating Sgt. Reyes, Defendants'
retaliation against her . . . for ending her relationship with
Mayor O'Neill went into high gear.")).

Additionally, unlike the hostile environment claim discussed
above, this claim is timely. As noted above, Díaz filed her Second
EEOC Charge on August 3, 2017. (Docket No. 31-1). Though she ended
her relationship with O'Neill back in October 2014, the *Amended
Complaint* outlines a years-long retaliation scheme that directly
resulted from that event. (Docket No. 51 ¶ 26). This scheme
continued through October 7, 2016 — 300 days before Díaz filed her
Second EEOC Charge — and allegedly continued through the date the
*Amended Complaint* was filed. (*See* id. ¶¶ 217-79). Construing the
well-pleaded facts in the *Amended Complaint* in the light most
favorable to Plaintiffs, as this Court must at this stage of the
proceedings, *see* Ocasio-Hernandez, 640 F.3d at 7, the alleged post-
October 2016 conduct is sufficiently tied to Díaz ending her
relationship with O'Neill to bar dismissal of this claim. And,
because there is no requirement that recent discriminatory acts be
explicitly based upon sex, the *quid pro quo* claim differs from the
hostile work environment claim and is better supported by the
allegations in the *Amended Complaint*.

Further, the Court finds that Díaz has satisfied the above-
described presentment requirement for this claim, barring its

dismissal at this stage of the proceedings. While the Second EEOC Charge only alleges retaliation for filing the First EEOC Charge, the alleged retaliatory scheme designed to punish Díaz for filing her previous EEOC Charge appears to be a continuation of the alleged scheme to punish her for ending her relationship with O'Neill. Therefore, the relevant acts in the *Amended Complaint* supporting a *quid pro quo* harassment claim constitute "collateral acts" that bear a close relation to the allegations in the administrative charge. Montalvo-Figueroa, 414 F. Supp. 3d at 237.

Thus, the Court finds that the *Amended Complaint* states a plausible and timely claim for *quid pro quo* harassment against the Municipality based on O'Neill and other city employees' retaliation for Díaz ending her relationship with O'Neill. The Municipality's *Motion to Dismiss* is accordingly **DENIED** as to Díaz's *quid pro quo* Title VII harassment claim.

### iii. Retaliation Claim

Alternatively, and, as the Municipality concedes, more convincingly (*see* Docket No. 53 at 13-14), the *Amended Complaint* advances a Title VII retaliation claim. Plaintiffs allege Defendants retaliated against Díaz for filing her First EEOC Charge on June 30, 2016 by creating a hostile work environment, in violation of Title VII. The First Circuit has held that, "under Title VII, the creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action

under Title VII." Hernandez-Mendez, 137 F. Supp. 3d at 151 (citing Noviello v. City of Boston, 398 F.3d 76, 86 (1st Cir. 2005)); *see also* Jelu Iravedra v. Municipality of Guaynabo, 2018 WL 5023314, at *7 (D.P.R. 2018) ("[A] hostile work environment may constitute an adverse employment action that gives rise to a cognizable claim of retaliation under Title VII, so long as the acts comprising the hostile work environment are severe and pervasive as to affect the terms and conditions of employment.").

Title VII retaliation claims follow the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03 (1973). First, the plaintiff "must establish a prima facie case of retaliation by providing evidence that one, she undertook protected conduct; two, her employer took a material adverse action against her; and three, a causal nexus exists between elements one and two." Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015) (internal quotation marks and citation omitted). If the plaintiff makes this prima facie showing, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions." Id. If the defendant succeeds, "the burden shifts back to the plaintiff to show that the defendant's explanation is a pretext for unlawful retaliation." Id.

As a threshold matter, there is no question that Díaz's act of filing her First EEOC Charge constitutes protected activity.

Id. ("Protected conduct includes the filing of formal charges of discrimination[.]"); *see also* 42 U.S.C. § 2000e-3 ("It shall be unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge . . . under this subchapter."). Additionally, it is beyond dispute that, taking the well-pleaded allegations in the *Amended Complaint* as true, Díaz was subjected to various material adverse employment actions after she filed the First EEOC Charge. (See Docket No. 51 ¶¶ 217-279). However, Defendants challenge the sufficiency of Díaz's retaliation claim on multiple other grounds, each of which is addressed below.

### 1. Alleged Failure to Tie Employer's Adverse Actions to Díaz Filing Her EEOC Charge

The Municipality first contends Plaintiffs failed to satisfy prong three of the above-stated prima facie test for retaliatory discrimination by not establishing a causal nexus between the employee's protected conduct and the employer's material adverse action against her. (Docket No. 53 at 16). The Municipality argues that Díaz's post-EEOC-charge allegations constitute no more than a potential breach of contract action against O'Neill for violating the terms of the parties' settlement agreement concerning the First EEOC Charge, and do not rise to the level of a Title VII retaliation claim. Id. at 17.

Contrary to the Municipality's contentions, the Court finds

that the post-EEOC-charge allegations in the *Amended Complaint* reach farther than those that would give rise solely to a breach of contract action related to the settlement agreement. While some allegations are clearly geared towards violations of the settlement agreement (*see, e.g.*, Docket No. 51 ¶ 217), the *Amended Complaint* plausibly outlines a retaliatory scheme by which Díaz was stripped of her authority and workplace responsibilities because she filed her First EEOC Charge. Id. ¶¶ 220-42; 248-49; 260 ("Lt. Rosa allowed Officer Díaz to perform her duties for a week or so. He was the only municipal employee to do so after Officer Díaz complained to the EEOC."). The alleged retaliatory hostile work environment also included incidents where Díaz was forced to watch coworkers point and laugh at her while passing her office and in the hallway. Id. ¶¶ 254-57. Drawing all reasonable inferences in Plaintiffs' favor, this Court finds that Plaintiffs have sufficiently tied the alleged retaliation to Díaz's decision to file her First EEOC Charge.

## 2. Temporal Proximity

Next, the Municipality challenges Díaz's Title VII claim because "there is a lack of temporal proximity between the adverse employment actions experienced by her and the alleged protected activity." (Docket No. 53 at 17). The Municipality takes issue with the seven-month gap between when Díaz filed her First EEOC Charge and when the alleged retaliation began, arguing the two

periods are "too attenuated to raise an inference of causation."
Id.

The Municipality's argument certainly has superficial appeal.
Courts in this Circuit have held that "[t]hree and four month
periods [are] insufficient to establish a causal connection based
on temporal proximity." Calero-Cerezo v. U.S. Dep't of Just., 355
F.3d 6, 25 (1st Cir. 2004). However, in this case, focusing on the
seven-month time lapse ignores the realities of the situation on
the ground. According to the *Amended Complaint*, during the seven-
month period at issue, Díaz and O'Neill were working behind the
scenes to settle Díaz's EEOC claims. (Docket No. 51 ¶¶ 207-215).
Therefore, if O'Neill or other Municipality employees had
retaliated against Díaz while O'Neill was actively attempting to
settle the EEOC charge, "it might well have made settlement more
difficult." Harrington v. Aggregate Indus. Ne. Region, Inc., 668
F.3d 25, 32 (1st Cir. 2012) (applying similar rationale in
addressing a FCA retaliation claim). Thus, applying the strict
temporal limitation the Municipality seeks would be unreasonable.

In the Court's view, the more relevant time period is the
single week between when the parties signed the settlement
agreement and when the alleged retaliation for filing the EEOC
charge began. (Docket No. 51 ¶¶ 215; 217). At this stage, affording
all reasonable inferences to Plaintiffs, that minimal gap between
the settlement agreement and the alleged commencement of adverse

employment actions establishes sufficient temporal proximity for
Díaz's retaliation claim to survive the Municipality's *Motion to
Dismiss*.

### 3. <u>Presentment</u>

Finally, the Municipality argues that the allegations in
paragraphs 277 through 279 of the *Amended Complaint* are beyond the
scope of Díaz's Second EEOC Charge, and thus should not be
considered as part of her Title VII retaliation claim. (Docket No.
53 at 18-19). Specifically, it contends Díaz's Second EEOC Charge
alleged only retaliation for filing her First EEOC Charge, and
thus any alleged harassment by O'Neill following his resignation
as mayor would not have been revealed in a subsequent investigation
based on those allegations. <u>Id.</u> at 19. The Court disagrees.

First, the Municipality misrepresents the current state of
the case law on this issue. The Municipality primarily relies on
<u>Powers v. Grinnell Corporation</u>, 915 F.2d 34 (1st Cir. 1990) in
arguing that incidents in a federal complaint may only be
considered if they are within the scope of what the plaintiff
alleged in her EEOC charge or any resulting investigation that can
reasonably be expected to grow out of that charge. (Docket No. 53
at 18-19). However, as described above, the First Circuit has
inconsistently applied variations of two tests in determining this
very issue. *See* <u>Montalvo-Figueroa</u>, 414 F. Supp. 3d at 236. As Judge
Besosa aptly noted, the <u>Powers</u> test is not the settled test

employed in this Circuit. Id. at 236. Instead, it represents "a practice not expressly repeated in subsequent decisions." Id.

Second, the allegations in paragraphs 277 through 279 of the *Amended Complaint* are part of the same narrative and history of harassment and misconduct alleged throughout the pleading. These allegations certainly qualify as "collateral acts" that closely relate to the allegations in Díaz's Second EEOC Charge. *See* id. at 237. Therefore, the Court may consider those allegations in determining that Díaz has stated a Title VII retaliation claim upon which relief can be granted.

Additionally, it is worth noting that, even if the Powers test were controlling, it strains credulity to believe retaliatory actions by O'Neill would not have been uncovered simply because he was no longer mayor at the time they occurred. Thus, the Municipality's argument would have failed under its own recitation of the case law.

Further, the Municipality takes issue with these specific allegations in the *Amended Complaint* because they concern actions by Mayor O'Neill "well after [he] resigned as Mayor." (Docket No. 53 at 19). However, according to the *Amended Complaint*, O'Neill resigned shortly *after* Díaz filed her Second EEOC Charge. (Docket No. 51 ¶ 277). At this stage of the proceedings, the Court must take "the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in

the pleader's favor," to determine "if they plausibly narrate a claim for relief." Schatz, 669 F.3d at 55. The Municipality failed to rebut the factual allegation concerning when O'Neill resigned with any document that this Court may properly take judicial notice of at this juncture. Thus, the argument is unavailing.

In sum, the Court may properly rely on the allegations in paragraphs 277 through 279 of the *Amended Complaint*.

### 4. Conclusion

For the above-stated reasons, the Municipality's *Motion to Dismiss* is **DENIED** as to Díaz's Title VII retaliation claim.

## C. Law 100

In addition to their federal law claims, Plaintiffs assert Puerto Rico state law claims. First, they allege Defendants' acts violated Law 100, Puerto Rico's general employment discrimination statute. (Docket No. 51 ¶¶ 285-86). However, it has long been settled that "Puerto Rico's Law 100 does not apply to municipalities, or to municipal officials when they are sued in their official capacities." Rodriguez Sostre v. Municipio de Canovanas, 203 F. Supp. 2d 118, 119 (D.P.R. 2002). While Plaintiffs rely on Perez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19 (1st Cir. 2011) in arguing that O'Neill should be held personally liable for his discriminatory acts committed in his personal capacity (Docket No. 60 at 3), this District has held that "Law 100 does not apply to municipal employees . . . in their individual

capacity" either. <u>Sanoguet-Valentín v. Mun. Gov't of Mayagüez</u>, 2017 WL 456462, at *3 (D.P.R. 2017). Therefore, reliance on <u>Perez-Cordero</u> is inapposite, as the defendant in that case worked for a private employer (Wal-Mart).

Further, Plaintiffs' claims against Alvelo and the conjugal partnership between her and O'Neill must be dismissed. There are no allegations in the *Amended Complaint* alleging that Alvelo contributed in any way to the alleged harassment. And the Puerto Rico Supreme Court has held that, under Law 100, "a conjugal partnership cannot be held liable for the sexually harassing conduct of one of the spouses." <u>Arroyo Rodriguez v. Econo Supermarket Inc.</u>, 204 F. Supp. 2d 289, 297 (D.P.R. 2002) (citing <u>Rosario Toledo v. Distribuidora Kikuet, Inc.</u>, 2000 WL 943550, at *6). Thus, Plaintiffs' Law 100 claims are **DISMISSED** in their entirety.

### D. Articles 1802 and 1803

Finally, Plaintiffs assert claims under Articles 1802 and 1803 of the Puerto Rico Civil Code. (Docket No. 51 ¶¶ 287-88). Article 1802 is Puerto Rico's general tort statute, and states that a person who "causes damage to another through fault or negligence" shall be liable in damages. P.R. Laws Ann. tit. 31, § 5141. Article 1803 applies the principle of *respondeat superior* to Article 1802 claims. P.R. Laws. Ann. tit. 31, § 5142.

### 1. Individual Claims

Plaintiffs' tort claims for their own alleged harassment and retaliation fail because their Article 1802 and 1803 claims are entirely duplicative of their Title VII claims. The Puerto Rico Supreme Court and courts in this District have held that, "to the extent that a specific labor or employment law covers the conduct for which a plaintiff seeks damages, he is barred from using the same conduct to also bring a claim under Article 1802." Santana-Colon v. Houghton Mifflin Harcourt Pub. Co., 81 F. Supp. 3d 129, 140 (D.P.R. 2014). This rule bars Plaintiffs' claims against the Individual Defendants as well. *See* Rosario v. McConnell Valdes, 2008 WL 509204, at *2 (D.P.R. 2008) (dismissing Article 1802 claims against individual defendants because the plaintiff also sought damages under Title VII against those individuals for the same conduct). Because the Court finds no independent tortious conduct by Defendants that would allow Plaintiffs to recover damages under the Commonwealth's general tort statute outside the conduct that is covered by their Title VII claims, Plaintiffs' supplemental Article 1802 and 1803 claims are **DISMISSED**.

### 2. Derivative Claims

The Court turns next to Díaz and Reyes's potential derivative Article 1802 causes of action for damages caused by the alleged Title VII violations to the other.

Díaz has no such derivative cause of action. As the First

Circuit explained, "[a] relative's Article 1802 claim is derivative of the principal plaintiff's claim in that it is premised on some harm to the principal plaintiff, **and if the principal plaintiff's claim fails, so too does the relative's derivative claim**." <u>Pagan-Colon v. Walgreens of San Patricio, Inc.</u>, 697 F.3d 1, 16 (1st Cir. 2012) (internal quotation marks and citations omitted) (emphasis added). Because Reyes failed to plausibly state any underlying causes of action, Díaz's derivative Article 1802 claim necessarily fails.

However, the Court cannot dismiss Reyes's derivative Article 1802 claim at this point because Díaz's Title VII claim against the Municipality survives the pleadings stage. *See, e.g.*, <u>Morell v. HP Corp.</u>, 2015 WL 1022280, at *3 (D.P.R. Mar. 9, 2015) (declining to dismiss spouse's derivative Article 1802 claim because plaintiff's Law 100 claim survived Rule 12 motions).

Defendants' *Motions to Dismiss* are therefore **GRANTED** as to any derivative claims under Article 1802 asserted by Díaz. The Individual Defendants' *Motion to Dismiss* is also **GRANTED** as to any Article 1802 derivative claims asserted by Reyes. However, the Municipality's *Motion to Dismiss* is **DENIED** as to Article 1802 claims asserted by Reyes that are derivative of Díaz's surviving Title VII claim against the Municipality.

### V.   CONCLUSION

For the foregoing reasons, the Municipality's *Motion to*

*Dismiss* at Docket No. 53 is **DENIED** as to Plaintiff Díaz's claims under Title VII for *quid pro quo* harassment and retaliation and Plaintiff Reyes's related derivative claims under Articles 1802 and 1803. The Municipality's *Motion to Dismiss* is **GRANTED** as to all other claims in the *Amended Complaint*. The Individual Defendants' *Motion to Dismiss* at Docket No. 55 is **GRANTED**.

  **IT IS SO ORDERED.**

  In San Juan, Puerto Rico, this 27th day of April 2022.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge
